## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOSEPH WALSH,<br><br>               Plaintiff,<br><br>    v.<br><br>OVENTROP CORP.<br><br>               Defendant. | CIV NO.<br><br><br><br>FEBRUARY 28, 2021<br><br><br>JURY TRIAL REQUESTED |

## COMPLAINT

Plaintiff, Joseph Walsh, ("Mr. Walsh" or "Plaintiff"), by and through his attorney Christopher S. Avcollie of Carey & Associates, P.C., hereby files this Complaint against Defendant Oventrop Corp. ("Defendant") seeking compensation for losses and damages sustained as a result of the Defendant's unlawful discrimination in the terms, conditions, and privileges of his employment based on his age and upon his perceived disability. The Plaintiff pleads as follows:

**I.     PRELIMINARY STATEMENT**

1.     This is Plaintiff's complaint pursuant to the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, et. seq. (ADEA); the Americans with Disabilities Act 42 U.S.C. § 12101, et. seq. (ADA); and the Americans with Disabilities Act Amendments Act, 42 U.S.C. § 12102(3)(A), et. seq. (ADAAA).  Plaintiff also alleges pendent claims for common law causes of action sounding in negligent and intentional infliction of emotional distress. The Plaintiff seeks

compensatory and liquidated damages under the ADEA, the ADA, and attorneys' fees and costs, and such other equitable relief as the Court shall award.

## II.      JURISDICTION, VENUE & PARTIES

2.      This action is authorized and instituted pursuant to Age Discrimination in Employment Act 29 U.S.C. § 621, et. seq. and the Americans with Disabilities Act 42 U.S.C. § 12101, et. seq. and pursuant to 28 U.S.C. §§ 451, 1331 and 1343(3) and (4). This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

3.      All of the allegations made herein occurred within the territorial jurisdiction of the United States District Court for the District of Connecticut.

4.      Plaintiff Mr. Walsh was at all relevant times a Connecticut resident with an address of 15 Sullivan Drive Granby, Connecticut 06035.

5.      Mr. Walsh's Affidavit attesting to the following facts, is submitted concurrently and incorporated herein by reference ("Walsh Aff.").

6.      Defendant Oventrop Corp. ("Oventrop" or "Defendant") was at all relevant times a Delaware corporation registered to do business in Connecticut. Defendant Oventrop is and was at all relevant times a wholly owned subsidiary of its parent corporation, Oventrop GmbH & Co. KG ("Oventrop-Germany"). During his employment Plaintiff reported to work for Defendant at their corporate location at 29 Kripes Road, East Granby, Connecticut 06026.

## III.     PROCEDURAL PREREQUISITES

7.       Mr. Walsh filed a dual charge of discrimination on the basis of age and for perceived as disability discrimination with the Connecticut Commission on Human Rights and Opportunities (CHRO) and the United States Equal Employment Opportunity Commission (EEOC) on December 1, 2020, against the Defendant named in this action.

8.     On December 2, 2020, the EEOC issued a Notice of Right to Sue for EEOC No. 523-2021-00379.  The Notice of Right to Sue is attached hereto as Exhibit A.

9.     All administrative prerequisites to the institution of this action have been satisfied.

## IV.     STATEMENT OF FACTS RELEVANT TO ALL CLAIMS

10.     The Plaintiff is currently 56 years of age, and his birthdate is ##/##/1964.

11.     For fourteen years and nine months the Plaintiff was employed by the Defendant.

12.     Oventrop maintains and propagates a pattern and practice of concerted age discrimination against employees significantly over the age of 40, including the Plaintiff. The Defendant purports to be an equal opportunity employer.  Despite these expressions of unbiased decision making, Defendant's pattern of replacing older workers in favor of hiring and advancing employees close to or under the age of 40 without apparent disabilities has had a disproportionate negative and adverse impact upon employees over the age of 40 with apparent disabilities, including the Plaintiff.

13.     Oventrop-Germany had a minor presence in the United States marketplace for a number of years, when in 2005 they decided to open a subsidiary company here, "Oventrop Corp." In December of 2005 the Defendant hired the Plaintiff to become the CEO of "Oventrop Corp." Day to day decisions regarding the subsidiary were initially made by the Plaintiff.

14.     Before being hired by Oventrop, the Plaintiff was the Northeast Territory Sales Manager for REHAU Corporation. Plaintiff was highly qualified for the position of CEO of Oventrop. At the time Plaintiff was hired he had a contract of employment which was in effect until his termination. Further, when Plaintiff was appointed as CEO of Oventrop, the Board of Directors of Oventrop-Germany issued a resolution granting him broad authority over the financial and operational affairs of Oventrop Corp.

15.     Throughout his tenure as CEO, the Plaintiff always performed well. The Plaintiff was evaluated annually at a corporate sales meeting in Germany. Plaintiff was consistently told that he was performing all of his duties in accordance with the expectations of his superiors at Oventrop.

16.     Plaintiff skillfully navigated the Defendant through several difficult business transitions and market challenges during his tenure as CEO. Further, the Plaintiff staffed the Defendant with key personnel and substantially grew the Defendant's U.S. market share.

17.     In August 2011, while the Plaintiff was representing the Defendant at a trade show in Tampa, Florida, he experienced the sudden onset of a great deal of pain, particularly in his back, which affected his mobility. The Plaintiff became temporarily semi-paralyzed and had to remain in his hotel room to rest, leaving his employee to run the show by himself.

18.      In September 2011, the Plaintiff was diagnosed with Ankylosing Spondylitis and Kyphosis by a rheumatologist. Ankylosing Spondylitis is an inflammatory auto-immune disease affecting the spine and large joints. Over time, it can cause some of the small vertebrae in the spine to fuse together, resulting in reduced flexibility and a hunched-forward posture, which it has in the Plaintiff's case. The afore said condition also causes severe pain in the back and joints.

19.     Notwithstanding his condition, the Plaintiff continued to perform all of the duties of his position diligently. The Plaintiff did not request or require accommodations or special treatment of any kind.  The Plaintiff has consistently performed his duties competently both before and after his diagnosis in 2011.

20.     Although the Plaintiff was often suffering a great deal of pain and his condition has worsened over the past few years, he never revealed his diagnosis to anyone at the

Defendant as he wished to keep his medical information private. Unfortunately, the Plaintiff's condition began to physically show itself and the Defendant became aware that Plaintiff had a serious condition.

21.     As the vertebrae in the Plaintiff's spine have become more fused together, his posture has become increasingly stooped and he is visibly hunched over much of the time. The Plaintiff's neck and spine bend at 60 degrees creating a large curve to his back. The curvature of the Plaintiff's spine has become more pronounced over the years and traveling has become more difficult.

23.     The Plaintiff's condition was especially aggravated by and visible after long airline flights. The Plaintiff would travel to Germany three or four times per year to report in to Oventrop. During these flights Plaintiff's condition would become especially painful and pronounced.

24.     Since approximately 2017, the Plaintiff's condition became very noticeable to others at the Defendant and the Plaintiff was sometimes visibly in pain. During the Plaintiff's trips to visit Oventrop-Germany, Defendant's employees would often ask the Plaintiff how his back was and if something was wrong. This type of intrusive and offensive inquiry by senior managers and executives of Oventrop became quite common while the Plaintiff was in Germany on business. The Plaintiff's symptoms would be aggravated during the long plane rides and he would arrive in a state of visible discomfort and very hunched over.

25.      One of the Oventrop Managers, a Mr. Schaub, told the Plaintiff that he: "Needs to stand up straight and be strong!" This type of humiliating, discriminatory and degrading comment on the Plaintiff's involuntary physical condition became a frequent topic of conversation amongst executives at Oventrop.

26.     The Plaintiff's sales staff in the U.S. also noticed his condition and upon information and belief, comments were made about Plaintiff's condition by members of the U.S. sales staff to executives at Oventrop. The Plaintiff's stooped over condition generated a lot of comments and he was told by one of the sales people that another sales person complained to Oventrop about the Plaintiff being "short" because of his back pain.

27.     Upon information and belief, the executives at Oventrop felt that the Plaintiff's spine problems were affecting his work and/or they did not like having a CEO with visible medical conditions.

28.     In February of 2020, the Plaintiff attended the ASHRAE (American Society of Heating, Refrigerating and Air-Conditioning Engineers) show in Orlando, Florida, along with representatives from Oventrop. Mr. Burmeister, the Export Manager and one of the persons to whom the Plaintiff reports at Oventrop, noticed the Plaintiffs discomfort after flying to Florida and asked the Plaintiff, "What kind of drugs are you taking?" The Plaintiff was taking no drugs except ibuprofen. Ever since then, whenever the Plaintiff speaks with Mr. Burmeister, he asks the Plaintiff obsessively about his back and about pain medication.

29.     These frequent inquiries by Mr. Burmeister regarding Plaintiff's back lead the Plaintiff to believe that Oventrop was becoming concerned enough about the Plaintiff's health to consider replacing him.

30.     Over the years, the Plaintiff was slowly permitted to hire additional sales staff. Approximately two years ago in 2018, Oventrop finally decided to allow the Plaintiff to hire an adequate sales force in the U.S. The Plaintiff hired a total of four salespeople with various territories, with plans to hire more.

31.     The salespeople were unable to meet the sales quotas assigned to them notwithstanding

the extensive support Oventrop provided them.

32.     When the Plaintiff, pursuant to his duties as CEO, sought to address the low-performing sales team by terminating the lowest performers and demanding increased performance from the remaining salespeople, Mr. Burmeister countermanded the Plaintiff's decisions, forcing the Plaintiff to retain the low performing staff and to lower the expected performance sales quotas for the 2020 fiscal year.

33.     Because Mr. Burmeister was the individual who constantly and repeatedly inquired about the Plaintiff's back condition in an aggressive fashion, it was clear that Mr. Burmeister was usurping the Plaintiff's personnel decisions regarding the sales staff because he believed that the Plaintiff was unable to manage Oventrop due to his condition and/or his age.

34.      The Defendant's decision to interfere with the Plaintiff's management authority without a Board resolution was clearly discriminatory based on Plaintiff's age and/or his apparent infirmity. Mr. Burmeister's constant and unrelenting discussion of the Plaintiff's back problems, pain levels, and drug regimen coincided perfectly with Oventrop's interference with Mr. Walsh's authority to terminate, discipline, or replace the underperforming sales staff.

35.     Since the start of his tenure at Defendant, the Plaintiff had employed his wife Karen Walsh (Mrs. Walsh) as an Administrative Assistant. Over the years, the Administrative Assistant's responsibilities increased substantially and the tasks required of her became increasingly onerous.

36.     In January of 2020, the Plaintiff granted Mrs. Walsh a raise in salary commensurate with the increased work and responsibility associated with her position.

37.     The Plaintiff's decision to give his wife a raise was criticized by the Oventrop Comptroller Thomas Schaefer and the Plaintiff rescinded the raise in response to this criticism.

38.     Although granting raises to Oventrop employees in his charge was well within the Plaintiff's authority as CEO, and notwithstanding the fact that he had violated no Oventrop policy or directive, the Defendant decided to interfere with the Plaintiff's executive decision.

39.     The Defendant's interference in the Plaintiff's executive decision making was part of the clear pattern of discrimination by Oventrop in that the Defendant's corporate officers were usurping the Plaintiff's authority as CEO because of Mr. Walsh's age and/or his apparent disability.

40.     The Defendant further interfered in the Plaintiff's authority as CEO in that it prohibited him from taking cost-cutting measures to address the decline in revenue from Covid-19 because of Mr. Walsh's age and/or his apparent disability.

41.      The Defendant took further action to unlawfully usurp the Plaintiff's authority as CEO based on his age and/or his perceived disability when the Plaintiff was told by the Defendant's Controller that he would not be permitted to pay any of Oventrop's vendors until further notice due to a shortage of cash flow. This instruction was an unprecedented and a direct interference with the Plaintiff's duties as CEO.

42.     On September 15, 2020, the Plaintiff was terminated without notice or explanation after more than 14 years of service to the Defendant based on his age and/or perceived disability.

43.      Mr. Burmeister was present at the virtual termination meeting which clearly demonstrates that his discriminatory animus against the Plaintiff based on Mr. Walsh's perceived condition was a motivating factor in the termination decision.

## V.     COUNT ONE: AGE DISCRIMINATION PURSUANT TO THE ADEA

1-43.    The allegations of paragraphs 1-43 are incorporated herein by reference as if fully set forth in Count One.

44.     Plaintiff, age 56 on the date of termination, was at all relevant times a highly qualified and competent employee of the Defendant, and a covered person pursuant to the Age Discrimination in Employment Act (ADEA).

45.     Plaintiff was subjected to a series of adverse employment actions as described herein, including but not limited to unequal treatment on account of his age, denial of the rights and privileges of his position as CEO and wrongful termination of his employment.

46.     The Defendant stated no reason for the adverse termination of the Plaintiff at the time of his termination. Any legitimate non-discriminatory reason for the termination which the Defendant attempts to advance during the litigation are therefore pretextual or false, and created after Plaintiff was terminated to justify the age based decision.

47.     The Plaintiff was denied equal treatment in the terms, conditions and privileges of his employment as stated herein above on account of his age in that he was:

      a. terminated without cause or notice in favor of a younger executive; and

      b. stripped of his authority as CEO notwithstanding Board authorization to manage the finances and personnel decisions of Oventrop.

48.     The Plaintiff's age was the but for cause of all of the adverse employment actions alleged herein.

49.     At all relevant times, the Plaintiff was performing his duties competently, was highly qualified for his position, and was in compliance with the reasonable performance expectations of the Defendant.

50.     On information and belief, the Defendant exhibited a pattern and practice of age discrimination. The Defendant discriminated against older workers in favor of hiring, retaining, promoting and employing younger workers.

51.     As a direct result of the Defendant's disparate treatment based on his age, the Plaintiff suffered loss of wages, loss of benefits, loss of career opportunities, damage to his reputation, loss of status and inability to locate suitable replacement employment, all to his loss and damage.

52.     Defendant should be held liable for discriminating against Plaintiff on account of his age, in violation of the ADEA.

## VI.   COUNT TWO: PERCEIVED AS DISABLED DISCRIMINATION PURSUANT TO THE ADA AND THE ADAAA

1-52.     The allegations of paragraphs 1-52 are incorporated herein by reference as if fully set forth in Count Two.

53.     Plaintiff can successfully establish a prima facie case of employment discrimination, pursuant to the ADA in that: (1) he was regarded as having a disability by the Defendant within the meaning of the statute; (2) Defendant is a covered employer under the ADA; (3) Plaintiff was qualified for his position and able to perform the essential functions of his job, with or without reasonable accommodations; and (4) Plaintiff experienced unlawful, discriminatory and adverse employment actions, when he was stripped of his authority as CEO and terminated without cause because of his perceived, but nonexistent, disability.

54.     The Plaintiff was regarded as having a disability within the meaning of the ADA and the ADAAA in that the Plaintiff has a physical condition called Ankylosing Spondylitis which is an inflammatory auto-immune disease affecting the spine and large joints. Over time, it can cause some of the small vertebrae in the spine to fuse together, resulting in reduced flexibility and a hunched-forward posture, which it has in the Plaintiff's case.

55.     Although the Plaintiff's physical condition does not substantially limit any of his major life activities, the Plaintiff was treated by Defendant as if it were such a limiting condition.

56.     The adverse employment actions taken against the Plaintiff as described herein above

were substantially motivated by the discriminatory animus of the Defendant, by and through its employees and executives, based on Plaintiff's perceived disability.

57.     Defendant cannot, and has not, provided a legitimate, non-discriminatory reason for these adverse actions taken against Plaintiff.  Based on Plaintiff's quality work and performance, any excuse proffered by Defendant is not legitimate and is merely a pretext for discrimination based on his perceived disability.

58.     As a direct result of the Defendant's disparate treatment based on his perceived but non-existent disability, the Plaintiff suffered loss of wages, loss of benefits, loss of career opportunities, damage to his reputation, loss of status, inability to locate suitable replacement employment, and emotional distress, all to his loss and damage.

59.     The Defendant should be held liable for discriminating against Plaintiff on account of his perceived but non-existent disability, in violation of the ADA and the ADAAA.

## VII.   COUNT THREE: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

1-59.     The allegations of paragraphs 1-59 are incorporated herein by reference as if fully set forth in Count Three.

60.     The actions of the Defendant as afore said constitute negligent infliction of emotional distress.

61.     Plaintiff can successfully establish a prima facie case of negligent infliction of emotional distress against the Defendant in that the Defendant's conduct as described herein above created an unreasonable risk of causing Plaintiff emotional distress.

62.     Plaintiff's distress was foreseeable and was inflicted by the Defendant in the course of its pretextual termination of the Plaintiff.

63.     The emotional distress was severe enough that it might result in illness.

64.     Defendant's conduct was the direct cause of Plaintiff's distress and resulted in severe emotional damage to the Plaintiff, with emotional, psychological and physical symptoms.

65.     As a direct result of the emotional distress inflicted by the Defendant in the course of its pretextual termination of the Plaintiff, the Plaintiff has suffered damages and losses including, but not limited to, emotional distress, mental pain, suffering, humiliation, and anguish, all or some of which is likely to be permanent and which has and is likely to continue to result in medical bills and on-going expenses for medical treatment.

66.     Defendants should be held liable for negligent infliction of emotional distress against the Plaintiff.

**VIII.   COUNT FOUR: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

1-66.   The allegations of paragraphs 1-66 are incorporated herein by reference as if fully set forth in Count Four.

67.     The actions of the Defendant constitute intentional infliction of emotional distress.

68.     Plaintiff can successfully establish a prima facie case of intentional infliction of emotional distress against Defendant in that the Defendant knew or should have known that emotional distress was likely to result to Plaintiff as a result of its extreme and outrageous conduct as described above.

69.     Defendant's actions inflicted against Plaintiff were at all times known, intentional and willful.

70.     Defendant's actions and conduct were extreme and outrageous, as fully described herein above.

71.     Defendants' actions and conduct were the direct cause of Plaintiff's distress.

72.     As a direct result of the intentional emotional distress inflicted by the Defendant in the

course of the Plaintiff's employment, the Plaintiff has suffered damages and losses including, but not limited to, emotional distress, mental pain, suffering, humiliation, and anguish, all or some of which is likely to be permanent and which has and is likely to continue to result in medical bills and on-going expenses for medical treatment.

73.     Defendant should be held liable for it's intentional infliction of emotional distress against the Plaintiff.

## XI.  DEMAND FOR RELIEF

WHEREFORE, Plaintiff requests the following relief:

    A.  A declaration that the Defendant intentionally and willfully discriminated against Plaintiff on account of his age and or perceived disability pursuant to the ADEA;

    B.  A declaration that the Defendant intentionally and willfully discriminated against Plaintiff on account of his age and/or perceived disability pursuant to the CFEPA;

    C.  Award of Compensatory damages, including loss of enjoyment of life, emotional pain and suffering, back pay, bonuses, and the value of all other employment benefits in an amount to be determined by the trier of fact;

    D.  An award of punitive damages;

    E.  An Order directing the Defendant to reinstate Plaintiff to his former position or, in the alternative, front pay for seven (7) years;

    F.  Award attorneys' fees and costs of litigation;

    G.  Award of pre-judgment interest;

    H.  Award post-judgment interest;

    I.  A money judgment to recoup any tax loss suffered by Plaintiff as a result of

receiving a lump sum award of back pay and front pay rather than having received wages over a period of years; and

J.   Award such other relief in law or equity as this Court deems appropriate.


## JURY TRIAL DEMANDED

Plaintiff respectfully requests a jury trial on all questions of fact raised by his Complaint.

Respectfully Submitted,
PLAINTIFF
JOSEPH WALSH

By: /s/ Christopher S. Avcollie
Christopher S. Avcollie (ct29034)
Carey & Associates, P.C.
71 Old Post Road, Suite One
Southport, Connecticut 06890
(203) 255-4150 tel
(203) 255-0380 fax
cavcollie@capclaw.com